IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY FULLILOVE, | ) |
| Plaintiff, | ) Case No. 24 C 2875 |
| v. | ) Judge Robert W. Gettleman |
| CITY OF CHICAGO, RICHARD PINA, in his individual capacity; RYAN SCHAFFER, in his individual capacity; DUBLIN BAR & GRILL, INC., d/b/a Dublin's Bar & Grill, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Henry Fullilove sued defendants the City of Chicago, two Chicago Police Officers, Richard Pina and Ryan Schaffer (the "Officers") in their individual capacities, and Dublin's Bar & Grill. He alleges that on April 11, 2022, he tried to enter Dublin's, was refused entry, and was then unlawfully arrested and maliciously prosecuted for disorderly conduct outside of Dublin's. His complaint asserts four counts: a federal claim under 42 U.S.C. § 1983 against the Officers for restriction of movement, false arrest, and malicious prosecution in violation of the Fourth Amendment (Count I); an Illinois state law claim for malicious prosecution against all defendants (Count II); an Illinois state law claim for a hate crime against Pina, the City, and Dublin's (Count III); and an Illinois state law claim for indemnification against the City (Count IV).

The City and the Officers moved to dismiss all four counts. Because plaintiff did not oppose dismissal of Counts II and III, the court granted the motion on those counts as to the City and Officers. But plaintiff did oppose dismissal on Counts I and IV. And because the City and

Officers attached and relied on extrinsic materials—namely, the officers' body worn camera ("BWC") footage and a witness's signed complaint for disorderly conduct—to argue that the court should dismiss those counts based on the Officers having probable cause to arrest plaintiff, the court notified the parties that it was going to convert the motion to dismiss on those counts into a Rule 56 motion for summary judgment. In doing so, the court allowed the parties to supplement the record as they saw fit. To that end, the court set a first deadline for the plaintiff to file an additional brief on the motion and a second deadline thereafter for the City and the Officers to file any response thereto. Plaintiff did not file any additional brief by its deadline. Because the City and the Officers did, the motion is now ripe. For the below reasons, the court grants the motion for summary judgment on Counts I and IV.

## BACKGROUND

### Plaintiff's complaint

In his complaint, plaintiff alleges the following facts. Plaintiff is an African American male. On April 11, 2022, he and his friend (also an African American male) tried to enter Dublin's to get food and drinks, but Dublin's bouncer (who was white) refused them. When plaintiff asked why, the bouncer became verbally aggressive and ordered them to get away from the door, telling them they were not welcome—all while continuing to allow white people into the bar. When he then complained about this discriminatory act, the bouncer became more aggressive, cursed, and adopted a fighting stance.

Plaintiff then spotted a Chicago police officer sitting in his patrol car across the street (later identified as Pina) and approached him to let him know what happened. In response, Pina gave plaintiff a menacing look, flicked a cigarette in plaintiff's direction, swore at Plaintiff and

ordered him to go away, and seemed to lean toward plaintiff holding what appeared to be his gun holster. Pina then drove off and plaintiff went back to Dublin's to speak to a manager.

At that point, other Chicago police officers arrived at the scene, led by Sergeant Schaffer. Schaffer was rude and verbally aggressive toward him and aggressively scolded him, ordering him to go home. Plaintiff insisted that he had done nothing wrong and, in front of the bouncer, informed Schaffer of what happened. The bouncer nodded in approval and confirmed what plaintiff had said (while at the same time laughing at plaintiff), and Schaffer then ordered other officers to arrest and charge plaintiff with disorderly conduct. While being arrested, plaintiff saw that Pina had returned and was standing outside his vehicle watching Pina with a menacing look. Plaintiff was arrested, charged with disorderly conduct, and ultimately spent the night in jail. The City later dismissed the charge on July 15, 2022.

Plaintiff later filed a complaint against the Officers, which was then escalated to COPA (the Civilian Office of Police Accountability). COPA released a Final Summary Report, which stated that investigators retrieved Pina's BWC, which captured Pina's interaction with plaintiff, showing that, after driving away from Plaintiff, Pina called an unknown individual. The report quotes from the BWC footage in which Pina tells the unknown individual to "lock" the door and to "stop talking to these fucking n*****s." Pina received a 180-day suspension for departmental violations, including using the N-word.

At no point before or during the police encounter, did plaintiff or his friend engage in conduct that would have given the Officers probable cause to arrest him. Instead, Pina was working with Schaffer and the Dublin's bouncer to "have him arrested without probable cause and maliciously prosecuted; all because of his race as an African American."

### The City and Officers' Statement of Facts

In their now-summary judgment filings, the City and the Officers tell a very different story—one that is supported with BWC footage, a witness's signed complaint, and affidavits from the Officers. In the early morning hours of April 11, plaintiff tried to enter Dublin's and was turned away by the doorman in an alleged act of racial discrimination. Plaintiff then walked over to Pina, who was seated in his police car near Dublin's. Plaintiff told Pina that he was denied entry into the bar and demanded that Pina intervene to force Dublin's to let him in. Pina explained that he could not do so and drove away.

At around 2:40 a.m., Schaffer responded to a request for a supervisor near Dublin's and saw plaintiff standing on a street corner about a half block from the bar. At around this time, Pina also returned to the scene.

The BWC footage shows that, at about 2:42 a.m., Schaffer began speaking with plaintiff, who was clearly agitated, acting inebriated, and requesting to be taken to jail. The footage shows that Schaffer tried to explain to plaintiff that he could not force the bar to let plaintiff in and tried to assist plaintiff with filing a police report that plaintiff suggested he'd like to make. While Schaffer patiently attempted to assist plaintiff, plaintiff proceeded to yell, swear at the officers, act erratically, request to be taken to jail, and accuse other officers at the scene of not taking his complaint seriously. At one point, he got so worked up and close to Schaffer trying to explain his situation, that he spit in Schaffer's face as he yelled.

Plaintiff suggested (if not admitted) to the Officers that he had been drinking. Schaffer also told plaintiff that he could smell the alcohol on plaintiff and that Schaffer believed that plaintiff was drunk.

4

After nearly 10 minutes of plaintiff ranting, plaintiff and the Officers walked to the front entrance of Dublin's, where Schaffer confirmed with the door staff that plaintiff was not allowed entry. Plaintiff then become more aggressive and erratic—demanding the name of the door staff, knocking on Dublin's window, yelling at staff from outside, screaming and swearing at the Officers, blocking the doorway, repeatedly demanding to be taken to jail, touching officer Schaffer, almost falling over, and refusing to leave until he obtained the name of the manager.

When the Officers tried to obtain the name of the manager, plaintiff tried to open the door and enter, despite having been told he was not allowed inside. Plaintiff continued to yell, to act erratically, and to create a scene. Then, as he was yelling, swearing, and now also aggressively throwing his arms about, plaintiff walked in the direction of two pedestrians who were standing in front of the bar, causing them to move away.

By this point, Pina had entered Dublin's and spoken to staff at the front door who stated that they wished to sign complaints against plaintiff. A complaining witness, Jeffrey Pesek, signed a complaint against plaintiff for disorderly conduct, which stated that plaintiff "yelled profanities at complainant and blocked the entrance" of Dublin's "in such a manner as to disturb [Pesek] and provoke a breach of peace."

And at around the same time—roughly 15 minutes after Schaffer arrived on the scene—plaintiff was seized by the Officers and arrested for disorderly conduct. He was ultimately charged with disorderly conduct.

## DISCUSSION

The court converted the City and Officers' motion to dismiss on Counts I and IV into a motion for summary judgment. Again, in so doing, the court allowed the parties to supplement

with additional briefing. Plaintiff did not file anything. The City and Officers, on the other hand, timely filed a response brief in support of the now-motion for summary judgment, along with a stand-alone summary judgment motion and accompanying Local Rule 56.1 statement of facts. The motion is now ripe for adjudication.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for a trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. It must instead "present affirmative evidence in order to defeat a properly supported motion." Anderson, 477 U.S. at 257. In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict in the nonmovant's favor. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir.1988). If the record as a whole could not lead a rational factfinder to find for the non-movant, then there is no genuine issue for trial and summary judgment is appropriate. Matsushita Elec., 475 U.S. at 587.

Generally, the existence in the record of a videotape capturing the events in question does not change these applicable standards. But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Rather, the court should "view[ ] the facts in the light depicted by the videotape." Id. at 381. Put simply, "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." United States v. Norville, 43 F.4th 680, 682 (7th Cir. 2022).

Here, the City and the Officers have provided all the affirmative evidence—including the BWC footage, the signed complaint, and the Officers' respective affidavits. For his part, plaintiff has chosen not "present any affirmative evidence" of his own "to defeat" the motion. Anderson, 477 U.S. at 257. Nor has he argued that the BWC footage was "doctored or altered in any way" or that "what it depicts differs from what actually happened." Scott, 550 U.S. at 379. With all this in mind, the court finds that, based on the record as whole, no rational factfinder could find for plaintiff on Count I, and summary judgment is thus appropriate on that count.

In Count I, plaintiff alleges that the Officers are liable under 42 U.S.C. § 1983. Section 1983 provides a cause of action against a person, who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws of the United States." Livadas v. Bradshaw, 512 U.S. 107, 132 (1994) (cleaned up). It provides the procedural vehicle "for vindicating federal rights elsewhere conferred." Graham v. Connor,

490 U.S. 386, 393-94 (1989) (citation omitted). A plaintiff asserting a section 1983 claim must identify the specific constitutional right that was infringed. Id. at 394.

Plaintiff here asserts that the Officers are liable under section 1983 for restriction of movement, false arrest, and malicious prosecution in violation of the Fourth Amendment. As the court explained in its order on the motion to dismiss, the existence of probable cause would defeat plaintiff's claim. See Neita v. City of Chi., 830 F.3d 494, 497 (7th Cir. 2016) ("To prevail on a false-arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest"); Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014) ("Because the presence of probable cause makes a warrantless arrest reasonable under the Fourth Amendment, the existence of probable cause is an absolute defense to a § 1983 claim for false arrest." (cleaned up)); Biddle v. Martin, 992 F.2d 673, 678 (7th Cir. 1993) ("Because probable cause existed for Biddle's arrest, his malicious prosecution claim is barred."); Barbaccia v. Vill. of Lombard, No. 19 C 5410, 2020 WL 469302, at *2 (N.D. Ill. Jan. 29, 2020) ("[I]f there was probable cause for [the plaintiff's] seizure, his Fourth Amendment claims fail."). And if there was even "arguable probable cause," the Officers would be entitled to qualified immunity. Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 714-15 (7th Cir. 2013) (qualified immunity "protects officers who reasonably but mistakenly believe that probable cause exists"). Plaintiff appears to have recognized this when he filed his complaint, where he alleged, for example, that "[a]t no point before or during the police encounter, did Plaintiff or his companions engage in conduct that would have given the Officers probable cause to arrest him," and that Pina, Schaffer, and the Dublin's bouncer sought to "have him arrested without probable cause" because of his race.

The Officers argue that summary judgment on Count I is proper because the BWC footage and Pesek's complaint establish just the opposite—that (1) there was probable cause to arrest plaintiff for disorderly conduct; and (2) there was at least arguable probable cause such that they are entitled to qualified immunity. They also contend that, "because Plaintiff did not file a supplemental brief opposing" summary judgment, plaintiff has "waived any argument in response to Defendants' arguments that both the Officers' BWC and Pesek's signed complaint show probable cause for Plaintiff's arrest existed."

The court agrees with the Officers. "Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause." Abbott, 705 F.3d at 714. "[B]ut if the underlying facts are undisputed, the court can make that decision on summary judgment." Id. Here, plaintiff has not meaningfully disputed the underlying facts on probable cause. As the court noted in its order on the motion to dismiss, plaintiff did "not assert in response to the motion [to dismiss] that the [BWC] videos fail to establish that the Officers had probable cause to arrest him for disorderly conduct." And he opted not to file any further paper on the matter after the court converted that motion into one for summary judgment and provided him the opportunity to do so. That is perhaps unsurprising: The BWC footage and Pesek complaint clearly establish that no reasonable jury could find that the Officers lacked probable cause to arrest him for disorderly conduct.

Determining probable cause requires "an objective assessment of what a reasonable officer could conclude based on information known to officers at the scene." Esco v. City of Chi., 107 F.4th 673, 676 (7th Cir. 2024). "In making that assessment, the court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what

9

he heard, and so forth." Id. at 677 (citation omitted). "An officer has probable cause when, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense." Id. (cleaned up). "And to form a belief of probable cause, an arresting officer is not required to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute." Sroga v. Weiglen, 649 F.3d 604, 610 (7th Cir. 2011) (cleaned up). Simply stated, probable cause requires only a probability—not a certainty—that a crime has occurred. Esco, 107 F.4th at 677.

Here, Fullilove was arrested and prosecuted for disorderly conduct under section 8-4-010(a) of the Chicago Municipal Code. Under that section, a person commits disorderly conduct when he knowingly does any act in such unreasonable manner as to provoke, make, or aid in making a breach of peace. Chi. Ill. Mun. Code § 8-4-010(a). "Illinois courts have looked to cases interpreting the similar Illinois disorderly conduct statute when construing the Chicago ordinance." Thayer v. Chiczewski, 705 F.3d 237, 248 (7th Cir. 2012).

Although Illinois courts recognize that "[d]isorderly conduct has never had a precise definition" and that "the types of conduct that may be disorderly conduct almost defy definition," Biddle, 992 F.2d at 677 (citation and internal quotation omitted), conduct that has traditionally been considered "disorderly" includes the making "loud and raucous noises" and exhibiting "unseemly, boist[erous,] or foolish behavior induced by drunkenness," People v. Albert, 243 Ill. App. 3d 23, 26 (2d. Dist. 1993) (citation omitted) (emphasis removed) (finding that yelling outside home at 2 a.m. rose to the level of disorderly conduct). It is also "well-established in Illinois that the act of blocking the free flow of pedestrian or vehicular traffic on public ways will

10

support a conviction for the offense of disorderly conduct." Jones v. Watson, 106 F.3d 774, 779 (7th Cir. 1997) (citing City of Chi. v. Fort, 46 Ill. 2d 12 (Ill. 1970) (affirming disorderly conduct convictions of individuals who were "blocking public passage on a sidewalk" and "standing in such a way as to block the entrances to a tavern, a laundromat, and a poolroom," and who refused to disperse when directed to do so)). And while "[a]rguing with a police officer, even in a loud, offensive manner, may not, by itself constitute disorderly conduct," "that does not mean that arguing with a police officer may never be disorderly conduct." Biddle, 992 F.2d at 677 (citation omitted). To the contrary, "[a]rguing can be disorderly conduct depending on the circumstances and the argument's tendency to create public disorder." Id.

Biddle is instructive here. The Seventh Circuit there affirmed the district court's grant of summary judgment on Biddle's section 1983 claim in which he asserted that two Illinois police officers unlawfully arrested and maliciously prosecuted him. Id. at 674. In doing so, the court held that "Biddle's drunken tirade created probable cause to arrest him for disorderly conduct." Id. at 678. The court explained that Biddle and his friends had been drinking when, at around 3:00 a.m., police pulled over his van—which was being driven by one of Biddle's friends. Id. at 674. The police arrested Biddle's friend for driving under the influence and asked the remaining passengers if they wanted to drive the van. Id. When they declined, the police said they'd have the van towed. Id. Biddle, who admitted that he was intoxicated, "began shouting" at one of the officers. Id. "He shouted and swore at her for almost ten minutes." Id. He then "walked up and down on the sidewalk, waving his arms, swearing and shouting." Id. The officers arrested him and took him to jail. Id. at 675.

In holding that "Biddle's drunken tirade created probable cause to arrest him for disorderly conduct," id. at 678, the court relied on the fact that "Biddle was intoxicated"; that he "launched a ten-minute tirade against [one of the officers], screaming, swearing and waving his arms"; and that "[h]e refused to calm down and continued this performance after she called for assistance," id. at 677. "This behavior," the court noted, "justifies a reasonable belief that [Biddle's] resistance to the tow might escalate once the tow truck arrived, generating a real possibility of physical confrontation between Biddle and the tow truck driver or the police officers." Id. at 677-78. And "this relationship between Biddle's unreasonable conduct and a breach of the peace," the court concluded, was "clear enough to satisfy the requirements of probable cause." Id. at 678.[1]

Like the officers in Biddle, the Officers here had probable cause to arrest plaintiff for disorderly conduct. The BWC footage shows that starting around 2:42 a.m., Officer Schaffer began speaking with plaintiff, and that plaintiff was clearly agitated, acting inebriated, and requesting to be taken to jail. Similar to Biddle, plaintiff also suggested—if not admitted—to the Officers that he had been drinking, and Schaffer said that he could smell the alcohol on plaintiff and expressed his belief that plaintiff was intoxicated. The BWC footage further shows that while Schaffer attempted to placate plaintiff, plaintiff proceeded to yell, swear at the

---

[1] Although the Biddle court ultimately affirmed on the basis of qualified immunity, see Biddle, 992 F.2d at 678, the court made clear that both it and the district court found that the officers there had actual—not just arguable—probable cause, see id. at 675 (explaining that the district court found that "the officers had probable cause to arrest him for . . . disorderly conduct"); id. at 677; ("[w]e believe the officers had probable cause to arrest Biddle for disorderly conduct"); id. at 678 ("We believe this relationship between Biddle's unreasonable conduct and a breach of the peace is clear enough to satisfy the requirements of probable cause."); id. ("we find that Biddle's drunken tirade created probable cause to arrest him for disorderly conduct").

officers, act erratically, and request to be taken to jail—even at one point getting so worked up and close to Schaffer that he spit in Schaffer's face as he yelled. And like Biddle, plaintiff progressively became more aggressive—demanding the name of the door staff, knocking on the window, yelling at staff from outside, swearing at the Officers, blocking the doorway, repeatedly demanding to be taken to jail, touching officer Schaffer, and refusing to leave. Finally, after roughly 15 minutes—and still more yelling, swearing, and even throwing his arms about (actions which prompted two pedestrians who were standing on the sidewalk to move away from the bar)—the Officers seized and arrested him.

Based on this behavior, a reasonable officer could have concluded that plaintiff's conduct would continue to escalate, "generating a real possibility of physical confrontation between [plaintiff] and [other pedestrians, bar patrons, bar staff] or the police officers." Id. at 677-78. As in Biddle, then, the "relationship between [plaintiff]'s unreasonable conduct and a breach of the peace [was] clear enough to satisfy the requirements of probable cause." Id. at 678.

This conclusion is further bolstered by the fact that the Officers contemporaneously received Pesek's complaint. "Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." Abbott, 705 F.3d at 716 (cleaned up); see also Kelley v. Myler, 149 F.3d 641, 647 (7th Cir. 1998) (probable cause to arrest plaintiff for trespass based on complaint and officers were not required to verify that plaintiff had crossed property line). Pesek's complaint stated that plaintiff "yelled profanities at complainant and blocked the entrance" of Dublin's "in such a manner as to disturb [Pesek] and provoke a breach of peace." Plaintiff has not pointed to any evidence to suggest

13

that it was unreasonable for the Officers to rely on Pesek's information or complaint. And as the Officers point out, they themselves "witnessed the described conduct firsthand."

In short: the BWC footage and Peske complaint plainly establish that plaintiff's behavior—his "drunken tirade," id. at 678; his "loud . . . unseemly, boist[erous], [and] foolish behavior," Albert, 243 Ill. App. 3d at 26 (emphasis removed); and his "blocking [of] the free flow of pedestrian . . . traffic," Jones, 106 F.3d at 779—created probable cause to arrest him for disorderly conduct. The court finds that, based on the undisputed evidence, no reasonable jury could conclude otherwise. The Officers are thus entitled to summary judgment on Count I for this reason alone.

But even if a reasonable jury could find that probable cause was lacking, the Officers would be entitled to qualified immunity, anyway. Although the "probable-cause standard inherently allows room for reasonable mistakes," qualified immunity affords yet another "added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed." Abbott, 705 F.3d at 714 (cleaned up). This added "arguable probable cause" layer "protects officers who reasonably but mistakenly believe that probable cause exists." Id. at 714-15.

"[W]hether arguable probable cause supports qualified immunity 'is a pure question of law' to be decided by the court." Dukes v. Freeport Health Network Mem'l Hosp., No. 3:19-cv-50189, 2022 WL 1085208, at *10 (N.D. Ill. Apr. 11, 2022) (citation omitted). And it is applied broadly in disorderly conduct cases. Indeed, given the "[i]ndeterminate language in the [disorderly conduct] statute," officers are usually afforded "broad discretion to determine

14

whether the circumstances of a particular situation . . . provide probable cause to believe there has been a violation." Humphrey v. Staszak, 148 F.3d 719, 727 (7th Cir. 1998); see also Dukes, 2022 WL 1085208, at *10 ("The loose nature of the [disorderly conduct] statute and various courts' struggles to define its scope . . . support[s] the defense of qualified immunity.").

The same undisputed facts discussed above establish that the Officers at least had arguable probable cause to believe that plaintiff was committing disorderly conduct. That is "because a reasonable person could have reasonably concluded that there was probable cause." Abbott, 705 F.3d at 718. So if the Officers made a mistake in determining that they had probable cause to arrest plaintiff for disorderly conduct, their mistake was a reasonable one and they are thus entitled to qualified immunity as a matter of law. Summary judgment on Count I is therefore appropriate for this additional reason.

In sum, the court finds that the Officers are entitled to summary judgment on Count I because there was probable cause to arrest plaintiff for disorderly conduct and, alternatively, even if there was not, there was at least arguable probable cause such that they are entitled to qualified immunity.

As a result, summary judgment on plaintiff's Count IV indemnification claim against the City is also appropriate. Indeed, because summary judgment is proper over the sole remaining Count against the Officers, there is no basis to hold the City derivatively liable here. Plaintiff has not argued otherwise. The court thus grants summary judgment on Count IV.

Finally, because the court has now disposed of all the claims against the City and Officers (including the federal section 1983 claim) the only claims remaining in this case are state law claims against Dublin's—namely, Count II (state law malicious prosecution) and Count III (state

law hate crime). Dublin's has separately moved to dismiss those claims for failure to state a claim. But because the court has disposed of the only federal claim in the complaint, the court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c). The court consequently dismisses plaintiff's state law claims against Dublin's without prejudice. See Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## CONCLUSION

The court grants the City and the Officers' converted motion for summary judgment on Counts I and IV [see Docs. 10 & 30]. The court denies as moot Dublin's motion to dismiss Counts II and III [Doc. 21] and declines to exercise supplemental jurisdiction over those claims and thus dismisses them without prejudice. This case is terminated.

So ordered.

           **ENTER:**

           **Robert W. Gettleman**
           **United States District Judge**

**DATE:**  February 12, 2025